520-0161-WC Zoe, LLC Appellant v. Illinois Workers' Compensation Commission Gregory Buckner, Appellee Mr. Weinstock, you may proceed. My name is Brian Weinstock. May it please the court, I represent Appellant Zoe, LLC. Initial housekeeping matter, Zoe's reply brief, page 10, fourth line from the bottom, should have said, had not, the word not was left out, notice signs of shark caught ankle when referring to the Sisbro case. Zoe is asking this court to reverse the findings of the circuit court and the commission and reinstate the findings of the arbitrator and Commissioner Simpson to deny benefits. Even if there is evidence in the record, which if undisputed would sustain a finding for the claimant, such evidence is not sufficient if upon consideration of all testimony and circumstances in the record, it appears the manifest weight of the evidence is against the finding. Resolution of facts and credibility decisions are ordinarily left for the commission, but the Illinois Supreme Court has noted there is a duty to set aside the commission findings when there are contrary to the manifest weight of the evidence. In our case, the commission found the 9-28-17 incident aggravated Buckner's preexisting condition to cause quote, new symptoms, quote, interfered with his ability to work and required surgery. The circuit court upheld the commission asserting there was a substantial foundation for the findings, but it failed to uphold, but it failed to indicate that even if there is testimony, which if uncontradicted would be sufficient to sustain the commission's award, the court has a duty to set aside the award. If the award is clearly against the manifest weight of the evidence and an opposite conclusion is clearly apparent. Why don't we talk about that? I think we know the standard of review and what the opposite conclusion means. I mean, to cut to the chase, in this case, there appears to be no question that the claimant had a preexisting condition. Is that correct? Yes, sir. Okay. You're well aware of the well-settled rule that a work-related injury can be compensable even if it's not the sole or the principal cause of the claimant's well-being and that the claimant may establish a causal connection if he or she can show that a work-related injury played a role in aggravating or accelerating a preexisting condition. And the claimant, of course, will point out the fact that there's testimony that the symptomatology changed, the work conditions did not cause a problem, that Gornett supported the preexisting condition that was aggravated by the work-related injury. Well, first of all, the symptoms did not change. The symptoms are the same as they were before. I was going to get to that. The witnesses that testify, the family members that the symptomatology did change? The medical records don't bear that out. I mean, if you look at all the medical records, there's consistent complaints of 10 out of 10 pain every time you went to the doctor before. You can't get worse than 10 out of 10 pain. The pain is consistently from Christmas of 2015, down the right leg. The pain is in the bone. The pain is always there. It's unbearable. It's sharp. It's annoying. It felt like it was in his bone. It was hurting every day. I mean, those are all but the records are the records. I mean, it's a well-documented how severe and prolific his problems were before this incident. The treatment that he was undergoing wasn't working because 10 days before this incident, he's in the doctor's office making the same complaints that he'd been making for one year and nine months with both doctors advising that conservative care would last up to six months. And after that surgery is a reasonable recommendation. He blew past the conservative care marker by June 1 of 2016, and was still doing the same thing with no noted improvement, just munching on narcotics for one year and nine months, even 10 days before when he was telling his coworker that he's having this consistent, horrible back pain that he doesn't know what to do about and it won't go away. All right, let me ask you this question. Obviously the commission credited the causation opinion of Dr. Gornett over the IME Dr. Kitchens. And the commission clued that Dr. Kitchens opinions were somewhat inconsistent and not as persuasive as those of Dr. Gornett. Now the commission does have the right to determine the credibility of the expert testimony, does it not? They have the ability to determine who's credible, yes. So how does that bear in your analysis that the decision was against the manifest way if they believe Gornett over Kitchens? Well, because if you look at the totality of the evidence, it's clear as day that Dr. Gornett had a false, inaccurate, incomplete, defective history. He reiterates twice that this gentleman, the first time he only gave one medical causation opinion was on the first day he saw him. He didn't have any of the prior medical records that day. The history was completely false and defective. He said this gentleman had low back pain two years ago, had one course of physical therapy and responded well. Each one of those things is false. If you look, let's break it down. The pain before was 10 out of 10 consistent, always present, unbearable, sharp, annoying, felt like it was in his bone and hurting every day. He only had not true. He had narcotics for one year and nine months, even up until 10 days before. He was on Ambien because he couldn't sleep almost every night for one year and nine months. He was referred to two separate orthopedics, Dr. Stewart and Dr. Vest in 2015 and 2017 for pain. He asked for a referral to pain management. He saw pain management, even though he denied it, it's in the records that he told the doctor he was going to pain management and he discussed invasive procedures such as a nerve, radiofrequency nerve ablation. Dr. Gornett also said he responded well. He didn't respond well. He had consistent severe low back and right leg pain complaints, even 10 days before this incident, which Dr. Gornett clearly didn't see that record because he said he didn't have any records with handwritten dates on him. And those records have handwritten dates from Dr. Schumann. He was taking narcotics at work. He was limping. He was consistently laying down on the job, which means if you're laying down, you can't do the work. He's consistently walking hunched over for the witnesses at work. And he has problems of just regular problems of daily life with sitting, standing, sleeping. And it was noted he was functionally limited. These are all the same problems that he's complaining about after. And they couldn't have gotten any worse because 10 out of 10 is the went to Dr. Gornett. Dr. Gornett claims that he has a full and accurate history, but Dr. Gornett, it's impossible because on 4918, one week before the trial, he says he did a drug stateswide drug search on this gentleman. And it found no prior evidence of narcotic usage. I mean, that is incredible. If you saw any, there's a mountain of records that go through the extent and nature of how often he was taking narcotics. I mean, if you didn't know that he, if he doesn't know that he was taking narcotics and there's no prior evidence to it, how can you possibly allow an award to stand when the one that ward hinges on Dr. Gornett's opinions? And he had a false inaccurate and defective history that he reiterated one week before the trial. And one key piece of evidence was this narcotic usage because he even testified that long-term narcotic usage for the back quote, could be a factor. Quote, I don't have any information regarding that and quote, I'd have to look at that with regard to whether he would decide medical causation. The other point is Dr. Gornett also testified, and this is really important additional information if shown to be in conflict or incorrect with what I have could cause me to change my opinion. My opinion is based on the information and facts I have. Well, clearly by admission of filing this 4918 report saying there's no prior evidence of narcotic usage, the information he had was bogus. It was defective. And then he goes on to say, if there's additional information, which would be inconsistent with that, then that could cause me to change my opinion. Absolutely. There's a mountain of evidence that's in conflict with his history, which is two years ago, he had this minor implication of a minor issue with his low back with physical therapy and he responded well. That's not remotely true. And he gave that causation opinion on 10-9-17 the first time he saw him. He had none of these of 2017. And all she gave us was 23 pages of records. She never gave us the 2015 MRI. So he didn't have that. And he testified that if he would have compared the two MRIs, he would have noted it in his records. His records never even referenced. He looked at both of them. Dr. Kitchens, on the other hand, had a full and complete accurate history. He knew that the at a doctor 10 months before the incident. He reviewed all the prior records and the radiological films. He specifically said he compared the two and there was no significant difference. And he said, this guy failed conservative care, which Dr. Kitchens, which Dr. Gornat agrees with, because it was more than six months. And after feeling conservative care there, he's a surgical candidate, which Dr. Gornat agrees with. And Dr. Kitchens said the surgery now is the same surgery as before, which by the way, is different in the Schroeder case. Because the Schroeder case, there was surgery recommendation before the incident, but after the incident, the surgery changed and was a completely different surgery, which is noted in the record. So also in the Schroeder case, there was an MRI done before the incident, which showed compression on a nerve root and also showed more degenerative changes from the prior two surgeries that the lady had. That's completely different than this case. This case, the MRI scans before and after showed no significant changes. Those are not the same cases. What about the claimant's testimony? There were differences as well. He had symptoms in his left leg. His ability to work was affected and the recommendations for conservative treatment versus surgical intervention. And Schroeder talks about finding that consistent reports of pain before and after the accident does not compel reversal of commission's causation findings when the claimant also experienced some changes in the ability to work. So how does Schroeder help you? Well, the fact, I mean, Schroeder has two different surgeries. One surgery, the recommendation before was different than the one that was recommended after the incident after it caused a different surgery. And the other thing is that the symptoms in my case are the same. Again, these records are clear. 10 out of 10 pain. Every single time he complained of pain before. Again, isn't that addressed in Schroeder? Doesn't Schroeder say finding that consistent reports of pain in before and after the accident, and you've been emphasizing that it's been 10 before, 10 after. Schroeder says the fact that you have that does not compel reversal of the commission's causation findings. Well, I mean, our case has a lot of different, more than, I mean, that's one point, but I mean, there's more to it than that. In Schroeder, the doctor Yazbeck had a complete understanding of the past medical history. Dr. Cornett doesn't remotely have a complete understanding of the past medical history. That's a big difference. So you're saying that this case is, I don't see how public policy could warrant giving an award to somebody on medical expert testimony where the doctor either knew that he was, knew that he had, he had seen these reports and knew about the narcotics. And then why did the court or misrepresented the court that he had no prior evidence of narcotics, or he never knew about it at all. Those are the only two options. Yazbeck knew in Schroeder, everything that went on and what had happened. Cornett didn't. So I it's, and it's blatantly clear from the records and even one week before the trial, Gornet still reiterating the same defective false history. And that was after his deposition when he should have known that his history was false and defective. So what is he trying to do here? Is he trying to what misrepresent to the court? I don't know. But Dr. Kitchens didn't. He had the full and complete history and, and, and, and, and stated it in his records. You know, Dr. Gornett also said that he examined this gentleman on 4918. And at trial one week later, the claimant said he never examined him on 4918. That didn't take place. So, you know, we have somebody who was not responding well to the medical care that both doctors agree that if you fail conservative care after six months, surgery is a reasonable recommendation. And this gentleman had failed conservative care way before this incident. In fact, he was still having problems 10 days before. And Dr. Gornett couldn't have seen that record because if he had, it references narcotics and he wouldn't have put together a report one week before saying there was no evidence of prior use of narcotics. Mr. Weinstock, let me ask you, I think an important question. Prior to the accident, claimant was complaining of pain, as you pointed out in fairness. He was treated conservatively. Did he miss any work due to the back pain before the accident you're talking about? He did miss work because one of the records from January 20th of 2016 says that he was getting medical care because he was trying to get back to work because of his pain. Did anybody recommend surgery prior to the accident? Nobody recommended in the record surgery, but Dr. Kitchens addressed that just because nobody recommended surgery doesn't mean he wasn't a surgical candidate. And both doctors agree I mean, just because you have cancer and nobody says you need treatment or surgery doesn't mean you don't need surgery. I mean, you know, that's that's a red herring. Mr. Weinstock, your time is up. You'll have time and reply. Okay. Thank you. Ms. Cooksey, you may respond. Thank you, Your Honors. My name is Christy Cooksey, and I represent the employee, Greg Buckner. The sole disputed issue on appeal is- Ms. Cooksey, could you turn up the volume a little bit? We're having a harder time hearing you. Oh, I'm on 100%. Okay, well, we'll try to- I'll try to speak up. I don't I'll get closer. That'd be great. Yeah, that helps a little bit. Okay, sorry for the extreme close up. All right, I'll try not to look. Okay, first, I'd like to review some undisputed facts that support causation that are about Greg personally. It's undisputed that Greg was struck by this bobcat. And I would like the commission, or sorry, I'm too used to being before the commission, the court to review the apologetic text messages by the employee that struck him who was worried about his physical condition. And those text messages happened well before there were any insurance companies or lawyers involved. The only employee that said that it was Greg that initiated the contract contact still offered to call 911. This was a significant incident. Greg had an undisputed job history of heavy labor for over seven years in concrete and asphalt work, including shoveling, looting and breaking up concrete. And he did this full duty with no restrictions that entire time. He has no prior workers compensation claims. This case is important. It's axiomatic about the legal principles that the employer takes the employee as he finds them. Why? Because it's undisputed that his current supervisor testified that he called and poached Greg after working with him three years prior to the job at Zoe because he was a good and dependable employee who never missed work. And so he wanted him to come work as a laborer on his crew. And in fact, Greg did that for another over three years for this employer, that same supervisor knew full well that Greg had back problems and understood those back problems, but also testified that Greg never missed work as a result of those back problems. Every doctor who testified under and all medical records show that Greg was functionally worse after this accident with regard to his work status. He had not missed work before this accident. One innuendo in a 2016 record is not evidence to contradict undisputed testimony of four different people who testified at arbitration. The Schroeder case is very clear that we would ask this court to defer to the commission's decision on this medical issue as they are owed great deference due to their expertise. And the question here is whether Greg's condition deteriorated after this undisputed work accident. We would ask that the court look at the significant admissions made by the only contrary medical evidence in the record, Dr. Kitchen. Dr. Kitchen admitted after reviewing the records that Dr. Schumann saw Greg 10 days before this accident. And the purpose of that visit, according to Dr. Kitchen's and Dr. Schumann's records, was for him to establish care with a new primary care physician. Dr. Kitchen admitted that Dr. Schumann took a thorough history and Greg self-reported the condition of his back. And yet Dr. Schumann notably did not order any tests, make any referrals or take Greg Buckner off work for back pain. And in fact, Greg worked up until he was struck by the Bobcat. Dr. Kitchen admitted that Dr. Schumann's next note after he was struck by the Bobcat and went to the emergency room was that his pain had increased and his functional status had decreased secondary to back pain related to being struck by a Bobcat. And not only did he make that note, but he took the further action of taking Greg off work until he could be seen by the very first orthopedic surgeon in this case, Dr. Matthew Gournette, who Mr. Buckner had never been in a surgeon's office before that. Dr. Kitchen's acknowledged that there was no record of Mr. Buckner ever receiving an injection before being struck by a Bobcat. And Dr. Kitchen's under oath, which is respondent's medical expert, had testified that he had never been seen by a surgeon or recommended for surgery prior to the work injury. Significantly, Dr. Kitchen admitted during his testimony that if somebody can bear their pain with conservative care and work full duty with no restrictions, there is no reason for that person to undergo surgery. And it is clear from Dr. Schumann's records that that is the Dr. Kitchen's further admitted that Mr. Buckner was capable of working full duty as a laborer before this incident and after this incident had not been able to return to work full duty on a consistent basis. Dr. Kitchen acknowledged that every medical provider that has seen Greg after this accident documented increased back pain along with constant radiation down the left leg. Prior to that, it was intermittent. Every prior medical record would show sometimes no radiation, sometimes some radiation. Constant after, and this is Dr. Kitchen's testimony under oath, and bilateral, which had intermittently, which had never been documented before. There were never right leg symptoms before this accident. Dr. Kitchen's acknowledged that Greg had not returned to baseline or pre-injury status. And interestingly, Dr. Kitchen opined when I asked him, when did he become a surgical candidate? He said September of 2017, which is when this accident happened. So if you look at the medical treatment, there are three times Greg got medical treatment in September of 2017. 10 days before this accident when the medical provider recommended nothing, and the ER that took him off work, and Dr. Schumann after this accident that said you can no longer work and now you need to go see a surgeon. So even based on Dr. Kitchen's opinion, there's only one logical choice here, and it's after the work accident. Dr. Kitchen's admitted that Greg had not returned to baseline or pre-injury status, and that because these radicular complaints were new and different, it would be important for him to go see a physician to determine the change of those symptoms. I read the Schroeder case very differently than my opponent in this case. My reading is that after two prior surgeries with the injured worker, the injured worker received a third surgical recommendation. Instead of proceeding with that surgery, she got off of social security disability and went back to work for only nine months where she had an undisputed accident that took her off work, and she went back and there was the same pathology and the same surgery. And the appellate court affirmed the commission that this was related because it was after a period of relative good health followed by an accident and subsequent injury that resulted in disability. Because of that, there was sufficient evidence to prove causal nexus. I would find this case more compelling in the fact that my client had not exhausted surgical or conservative care prior to this accident. He had never even had an injection. He certainly had never visited a surgeon. He certainly did not have a surgical recommendation, and all evidence shows that he was working full beauty with no restrictions, and his employer was satisfied with his work prior to this work injury. Dr. Gournett's testimony makes sense. He said, when you see somebody with a flat tire on the side of the road and you see the nail in the tire, you can talk about the wear and tear on the tire all day long, but it's clear the nail is why that tire lost function. That's what happened here in this accident. My client had wear and tear before this accident. Nobody's denying that, but the nail that caused him to lose function was getting struck by this bobcat, and contrary to counsel's test argument, Dr. Gournett didn't change his opinion. He said two things would have changed it. Number one, if he was never struck, and we all know that's not true. The mechanics didn't matter. The force didn't matter. If he was struck, that was enough, and the commission said the same thing. His prior condition made it more likely that even a minor impact would change his health. The second thing Dr. Gournett said would change his opinion is if we could show that he was consistently off work prior to this accident as a result of his low back pain. Again, none of that is in the evidence. Dr. Gournett said, I will take all the records you show me as true. I've read Dr. Kitchen's report. I take it as true, and that has not changed my opinion, and in fact, he testified under oath that he was aware of the narcotics, and not only that, I would direct you to page 1813 and 1814 of the record where he said, and I pulled it up, and I quote, the current scan talking about the 17 scan shows clearly a larger annular tear. It's obvious, and I'm happy to circle that and show anyone its presence. It's clear from the testimony on me under oath that Dr. Gournett had sufficient evidence to make his causation opinion, and he never changed it. Dr. Kitchen's on page 120 of his written report says no treatment is related to this accident. However, page 987 of the record, I asked him, so it wasn't reasonable for him to go to the ER after this? He said, well, no, that would be reasonable and related to the injury, and what about his referral to Dr. Schumann? Oh, yeah, you would want to follow up because the ER said that, and then what about Dr. Schumann's referral to Dr. Gournett? No, now that's not related, but again, he acknowledged that there was treatment related to this accident, and he did change his opinion. We would ask this court not substitute its judgment for that of the commission according to the Schroeder case and affirm the commission's decision. The commission found in its opinion that was 15 pages long and well-reasoned. Based on the totality of the evidence, the accident on September 28, 2017 aggravated the petitioner's pre-existing condition, which thereafter interfered with his ability to work and required more extensive medical treatment, including the surgery recommended by Dr. Gournett. We would ask that that well-reasoned opinion be affirmed, and I would offer to answer any questions. I don't believe we have any, Ms. Goodsee. Thank you for your argument. Mr. Weinstock, you may reply. Sure, thank you, Your Honor. Just briefly, the text messages, the claimant clearly, first of all, at the scene of the accident, the claimant was deemed to be laughing and not having any issues. In fact, that night during the text messages, he text back and said he was fine. Being a good employee is good, but with regard to the issues today, that's, we're talking about medical issues, so I don't see how that's relevant. One thing that was touched upon was noted that every doctor said that he had an increase in symptoms. Well, guess what? The emergency room on 10-1, Dr. Schumann and Dr. Gournett, all in October, didn't have any of these prior medical records, so there's no way that they could say that the symptoms had increased or gotten worse, because none of them had seen the prior medical records where every single time this guy is saying, 10 out of 10 pain, pain in my bone, I'm always having it, I'm hurting every day. I mean, I don't know how, as a physician, you could say that it's increased when you don't have a basis to be able to compare whether it was increased from what was going on then as compared to before. Can I ask you a question? What is the significance of the argument that your opponent makes that there is a substantial change in symptoms? Well, number one, it's purely subjective to say afterwards that he can't work. It's obviously in his favor to say he can't work. Wasn't he ordered off work by a doctor? He was ordered off work by a doctor, but the doctors didn't have any of the prior medical records to see what was going on before, and what is a doctor going to do when you come into their office, and he's telling them what he's telling them, and we all know that Dr. Gornad is well-versed in workers' compensation and has handled numerous cases with, and it's even... The fact remains that based on the evidence in this record, there was a change in functionality. He worked before the accident, didn't work after the accident, was held off of work after the accident by a doctor. Now, how that is to be interpreted and the weight to be given to that testimony is a matter for the commission. It's not a matter for us. Well, in terms of saying he quote worked, yeah, he showed up, but if you look at the medical records, he was, what, having serious functional problems standing, walking, sitting. He was lying down on the job. If you're lying down on the job, you can't be working. If you're lying down, he's also... Did the employer complain about his work when he returned back? The supervisor knew him before, knew he had back pains problems, testified he had that, was consistently asking him if he was okay. They all knew that he was lying down on the job. They essentially needed a worker and they had known him, so they'd hired him because they knew who he was and that he would show up. Did he, in fact, have any complaints about not being able to perform the duties he was hired to do? I mean, there was complaints in terms of him lying down on the job. There's complaints that notice that he's, obviously he can't work when he's laying down on the job. He's taking narcotics at work because he's obviously having problems. You're not answering my question. My only point is whether or not he was lying down on the job. My reading of the record indicated that he laid down to stretch his back out when he had the opportunity and that there wasn't any complaint about him not performing his duties after he went back. I also don't recall in the record the employer knowing or complaining about his narcotic use while he was at work. They didn't know he was taking narcotics. All they knew that he was taking was a white powder, which he said was aspirin. They didn't know that he was, whatever that is, right? Well, that's not the narcotic. They didn't know he was taking narcotics. Right. And that's what I'm saying. As far as the employer was concerned, my reading of the record shows that there were no complaints about his work performance before, during, or after the accident. Well, I mean, if they knew he was taking narcotics and out at the job site using equipment and stuff like that, maybe there would have been a problem. But no, he never said anything to them about that. Mr. Weissel, let me ask you something I don't think that can be disputed or misinterpreted. Ms. Cooksey referenced that she asked your expert, Dr. Kitchens, at the hearing when the claimant became a candidate for surgery. And did Dr. Kitchens say after the accident? No, that's not true. He said that he became a surgical candidate. I don't know the exact language, but it was at least by September 18, 2017, 10 days before the incident, because he had said that six months in the Schumann record, six months before, he had said that he had been diagnosed with a pinched nerve. And he had also had failed. It was more than that. He had failed conservative care. He was still on narcotics. He was still complaining of back and leg pain. And Dr. Kitchens noted that in that record, 10 days before the incident, he told Dr. Schumann wrote down that he had been diagnosed with a pinched nerve six months before. Dr. Schumann did not recommend he be taken off work or change his work schedule, did he? Is that what you're telling us now? Dr. Schumann noted he was functionally limited. Did he specifically take him off work? I did not see that, but he said he was functionally limited. Well, thank you for answering that. Okay. Your time is up, Mr. Weinstock. We'll let you run over. Counsel both, thank you for your arguments in this matter. It will be taken under advisement.